**UNITED STATES of America, Appellee,**

v.

**Ligia Maria Valencia GAVIRIA and Martha Lucia Bedoya Lopez, Defendants-Appellants.**

**Nos. 1087, 1088, Dockets 83–1341, 83–1353.**

United States Court of Appeals, Second Circuit.

Argued April 17, 1984.

Decided July 20, 1984.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Allyne R. Ross, Joan M. Azrack, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for appellee.

Frank A. Lopez, Brooklyn, N.Y., for defendant-appellant Valencia Gaviria.

Lynn F. Stewart, New York City, for defendant-appellant Bedoya Lopez.

Before FRIENDLY, PIERCE and WINTER, Circuit Judges.

PIERCE, Circuit Judge:

Valencia Gaviria ("Valencia") and Bedoya Lopez ("Bedoya") appeal from judgments of conviction entered on September 16, 1983, pursuant to jury verdicts in the District Court for the Eastern District of New York, Eugene H. Nickerson, *Judge.* Each appellant was charged in a two-count indictment with (1) conspiracy to distribute and to possess with intent to distribute a quantity of cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count One), and (2) possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Two). Bedoya was convicted of Count One and acquitted of Count Two. Valencia was convicted of both the conspiracy count and the substantive count.

On appeal, appellants principally contend: (1) that the district court erroneously denied their motions to suppress certain evidence seized just prior to their arrest, (2) that the district court improperly denied their Rule 29 applications for judgment of acquittal on the conspiracy charge, (3) that the district court erred by permitting the government to present its rebuttal case, and (4) that the evidence was insufficient to support their convictions. Because we agree that the evidence was insufficient to support appellant Bedoya's conviction on Count One for conspiracy to possess with intent to distribute cocaine, and because the indictment charged a conspiracy only between Bedoya and Valencia, we reverse and dismiss both appellants' convictions on Count One. As to Valencia's conviction on Count Two, we conclude that the district court properly denied the motion to suppress, and that the evidence was sufficient to support the conviction; accordingly, we affirm Valencia's conviction on Count Two.

## I. BACKGROUND

Appellants were arrested on May 4, 1983, in Queens, New York, and on May 13, 1983, the aforementioned two-count indictment was filed against them. Prior to trial, Valencia and Bedoya moved to suppress evidence seized by agents of the New York Drug Enforcement Task Force ("Task Force") during the course of searches of Bedoya's automobile and of an apartment once inhabited by Valencia. A suppression hearing was held on July 6, 1983, after which Judge Nickerson denied the suppression applications. A trial by jury followed.

### A. THE SUPPRESSION HEARING

At the hearing, the government presented the testimony of two Task Force mem-

bers, Paul Krajewski and Jose Luis Guzman. Their testimony, which is largely undisputed, established the following facts:

Krajewski testified that for approximately one year prior to appellants' arrest he had been engaged in an investigation of a cocaine trafficking organization that originated in Columbia, South America, and was headed by Miguel "Paco" Sepulveda. The Task Force believed that the "Sepulveda organization" consisted of, among others, Paco's wife Vicki Sepulveda, and her sister, appellant Valencia. Paco Sepulveda was indicted on federal narcotics charges in 1978, but remained a fugitive until January, 1983. After Sepulveda's arrest, the Task Force's investigation focused on possible successors to head the cocaine organization in New York; both Valencia and Vicki Sepulveda were considered likely candidates for the position.

Krajewski testified that during the pre-arrest search for Paco Sepulveda, in February of 1982, a tip from agents in Miami, Florida, led Krajewski and other Task Force agents to 142–02 84th Drive in Queens, New York, where they hoped to find Paco. Although Paco was not there, the agents arrested two illegal aliens and found a wallet containing residency papers and a social security card; the wallet belonged to defendant Bedoya. Krajewski stated that he met Bedoya when she came to the precinct to claim the papers taken from the 84th Drive apartment; that she was interviewed at that time about her knowledge of the Sepulveda organization and her relationship with Valencia; and that she was very cooperative in identifying photographs of members of the organization.

In May of 1982, Krajewski received information from the Queens Homicide Task Force that a certain address in Queens— apartment 3B at 31–24 35th Street—was being used as a "stash pad" for the Sepulveda organization. According to Krajewski, over the course of the following year he and his partners conducted surveillance of the 35th Street building for hundreds of hours, but saw no one enter or leave apartment 3B. Through interviews with occupants of the building the Task Force agents learned that mail for the apartment was not picked up, that people came and went from the apartment for short periods of time late at night, and that the electricity in the apartment was not turned on. The agents could not observe whether there was activity in the apartment because the windows facing the fire escape were boarded up. In early January of 1983, just weeks prior to Paco Sepulveda's arrest, the agents observed people moving furniture from the 35th Street apartment to an address in Bayside, Queens, the same Bayside address in which Paco Sepulveda was eventually arrested. In addition, through the use of a pen register device placed on appellant Valencia's phone, the agents learned that she had made calls to the 35th Street apartment.

Krajewski further testified that in the early part of May, 1983, he received a tip that Bedoya was renting vehicles on a weekly basis from Transnational Car Rentals, located in Queens. On May 3, 1983, Krajewski went to the car rental agency, where he observed a Hispanic male arrive in an automobile allegedly rented by Bedoya. When the male left the agency Krajewski followed him to 88–25 Corona Avenue, Queens. Later that same day, Krajewski observed Valencia arrive by car and enter the Corona Avenue residence.

The following day, May 4, 1983, Krajewski resumed surveillance at the Corona Avenue address at approximately 11:00 a.m. About one hour later, he observed Bedoya arrive, park her car and enter 88–25 Corona Avenue. She remained inside for almost thirty minutes, then she and Valencia left the house and entered Bedoya's car. Krajewski followed appellants to Baxter Street in Queens, where Bedoya parked and remained in the car, while Valencia entered an apartment building on Baxter Street. Valencia returned to the car about one half hour later. In the meantime, Detective Raymond Vallely had joined Krajewski. Bedoya and Valencia drove off followed by Krajewski and Vallely. The agents, how-

ever, lost sight of appellants after Bedoya made several right turns. The government contends that Bedoya "squared" the block in an effort to lose the agents.

Later that same day Krajewski and Vallely returned to the Corona Avenue address where Krajewski had first observed Bedoya that morning. They saw Bedoya's automobile parked in front of 88–25 Corona Avenue. After a short time, appellants left the building and, followed by Krajewski and Valley, proceeded to 31–24 35th Street (the alleged stash pad), where they entered the building and remained for approximately thirty minutes. When the appellants left the building they stopped at the front door and looked to the right and to the left before proceeding down the block. Krajewski testified that, at the time, he and Detective Vallely were sitting in an unmarked car; that the appellants looked in the agents' direction and then proceeded to a nearby grocery store; that in the store Valencia stood by the window looking out in his direction; and that, minutes later, Bedoya and Valencia left the store and entered Bedoya's car. As appellants began to drive away, Krajewski and Vallely approached the car on foot, identified themselves as law enforcement officers, and asked Bedoya, the driver, to pull over. Krajewski, speaking to Bedoya in English, asked Bedoya to produce her license and registration; she complied. Krajewski then asked Bedoya where she was coming from and where she was going. Bedoya replied that she had just come from the grocery store, that prior to that she was at Corona Avenue, and that she was going to the Bronx. Krajewski then asked Bedoya and Valencia if they would accompany the agents to an apartment house on 35th Street—no address was specified. Both women agreed to do so, left the car, and proceeded to walk in front of the officers along 35th Street. As they did so, Detective Guzman and Sergeant DiNapoli joined them. They continued walking until they reached the apartment house at 31–24 35th Street where both women stopped. When asked, appellants agreed to accompany the officers into the building; appellants entered the building and led the way upstairs to apartment 3B. Guzman asked Valencia if she lived there, and Valencia stated that she did. Guzman then asked Valencia if the officers could enter the apartment and search for narcotics. Valencia assented, but added that anything found there was not hers. Detective Vallely asked Bedoya for her keys, which she produced, but they did not fit the locks. Valencia produced her keys and, because Vallely was unable to open the door, she aided the officer in unlocking the door.

In the apartment, the agents discovered various items of narcotics paraphernalia, including two triple beam scales, strainers with white powder residue, and a quantity of material which is used to dilute cocaine for sale. The agents also found approximately one half pound of cocaine in a locked metal box, which was opened with one of the keys that Valencia had produced, and 404 grams of cocaine in a suitcase found in one of the kitchen cabinets. Detective Guzman placed both women under arrest and informed them of their *Miranda* rights. Valencia asked to speak to Guzman privately and, once alone, told him that she had moved to Corona Avenue and no longer lived in the apartment, and that she had rented the apartment to a man whose name she did not know. Bedoya also asked to speak with Guzman privately and, she told Guzman that whatever was found in the apartment did not belong to her.

Appellants were taken outside and placed in a police vehicle. Bedoya inquired whether her car, which was parked away from the curb, would be safe. Krajewski requested her car keys, which Bedoya produced, and Krajewski moved the car closer to the curb. As he left the car, however, he noticed a small plastic bag containing a white powdery substance on the floor in the back of the car behind the passenger's seat. He picked up the plastic bag, showed it to Vallely and the appellants, and informed Bedoya that her car would be seized. Bedoya replied: "the cocaine wasn't found on my side of the car, was

it?" Subsequent analysis revealed that the bag contained seven grams of cocaine.

The agents drove to 88–25 Corona Avenue, which Valencia had stated was her current residence and she gave the officers consent to search her apartment. No contraband was found, but the agents seized a photo album that included a photograph of Bedoya.

After hearing this testimony, Judge Nickerson ruled on appellants' applications to suppress the drug paraphernalia and the cocaine found in apartment 3B, at 31–24 35th Street, and the seven grams of cocaine found in Bedoya's car. The district judge found that the agents had reasonable suspicion to believe that apartment 3B was a stash pad and this, coupled with their observations of both women, amounted to reasonable suspicion to stop appellants for questioning under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). According to Judge Nickerson, appellants' subsequent statements to the agents that they had not earlier been in 31–24 35th Street extended the time for the *Terry* stop. He also found that, in any event, both Valencia and Bedoya had voluntarily consented to accompany the agents to the 35th Street building, and he noted, even in the absence of consent, appellants' previous false statements had increased still further the time allowed for a valid *Terry* stop. Finally, the district judge found that Valencia's consent to enter and search apartment 3B was given voluntarily. Accordingly, he denied the motions to suppress any of the seized evidence.

## B. THE TRIAL

### (1) The Government's Case

The trial began on July 7, 1983. The government's witnesses were Krajewski, Guzman and Vallely. Krajewski and Guzman essentially repeated the testimony they had given at the suppression hearing. Vallely testified that he had accompanied Krajewski on the surveillance on May 4, 1983, and his testimony of the events that transpired was similar to that of Krajewski

and Guzman; therefore, we will not reiterate that evidence.

During cross-examination of Krajewski, Bedoya's trial counsel elicited that when Krajewski first approached appellants after he stopped Bedoya's car on 35th Street, he inspected the inside of the car, including the back seat and floor, and did not see any plastic bag at that time. Krajewski testified that from the time he stopped the car to the time appellant Bedoya left it, he stood next to her on the driver's side, and followed her movements. Krajewski also testified that although Vallely initially approached the passenger's side of the car, he eventually walked over and joined Krajewski on the driver's side. The obvious purpose of this inquiry was to demonstrate that it was quite unlikely that Bedoya could have placed the plastic bag containing the seven grams of cocaine in the back of the car behind the passenger's seat unobserved.

Later, through cross-examination of Krajewski, defense counsel demonstrated that Bedoya had not been previously observed entering or leaving the stash pad on 35th street; that none of the descriptions of persons provided by neighbors resembled Bedoya; and that although papers containing the names of various individuals were seized from the 35th Street apartment during the May 4th search, none of those papers contained Bedoya's name or signature and no other material suggesting Bedoya's presence in that apartment was found.

### (2) Valencia's Defense

Valencia testified that she moved to apartment 3B at 31–24 35th Street in Astoria, Queens, in the summer of 1982 and remained there for two months, until sometime in October, 1982. While she was living there her brother-in-law, Paco Sepulveda, asked to rent the apartment, and requested that she keep the lease in her name; Valencia agreed. Paco moved in and provided her with the rent through an individual named Carlos Arturo, and Valen-

cia, in turn, mailed the rent via money order to the building superintendent.

In March, 1983, approximately three months after Paco was arrested, Carlos Arturo returned the keys to apartment 3B to Valencia, and informed her that the apartment would be transferred to a Jorge Alberto Lopez. Valencia stated that although she had met Jorge Alberto Lopez two days prior to her arrest, she did not give him the keys because it was her understanding that she was to turn the keys over to the superintendent, and that Lopez would rent the apartment directly through the superintendent. She explained that she went to the 35th Street apartment on May 4, 1983, to speak with the superintendent about the transfer and to pay the rent.

Valencia testified that she knew Bedoya for a period of three and one half years; that during the morning of May 4, 1983, she phoned and asked Bedoya to drive her to the bank to obtain money orders to pay rent on the Astoria and Corona Avenue apartments; and that Bedoya agreed. Valencia explained that after having Bedoya drive her to a friend's house on Baxter Street and then to the bank, the women ate lunch, returned to Corona Avenue, and then proceeded to the 35th Street apartment to see the superintendent. Valencia stated that she had not been to the apartment in months; that she was surprised at its disheveled condition; that she saw the drug paraphernalia, the suit case and the metal box, but did not see any cocaine; and that upon leaving the building she gave the rent to a man on the first floor of the building. Valencia also denied putting any cocaine in the back of Bedoya's car.

### (3) Bedoya's Defense

Bedoya's defense began with her employer, who testified to her reputation in the beautician community as a responsible and honest person. Next, in an attempt to overcome the government's implication that Bedoya deliberately tried to lose Krajewski and Vallely when she left the Baxter Street address, defense counsel called

an investigator for the Legal Aid Society, who testified that the Republic National Bank, from which the money orders were purchased on May 4, 1983, was located in close proximity to the Baxter Street location and that the route taken by Bedoya was a direct route to the bank.

Bedoya took the stand and testified that she was thirty-one years old, a legal resident of the United States, the mother of two children born in the United States, and that she was employed as a beautician. Bedoya's friendship with Valencia dated back three and one half years when the two women lived in the same building and Bedoya attended to Valencia's cosmetic needs. Bedoya admitted meeting Paco Sepulveda on social occasions two or three times and that she knew he was involved in drug trafficking. According to Bedoya, on May 4, 1983, she agreed to drive Valencia to the bank to obtain money orders and to act as her interpreter. After she arrived at Valencia's Corona Avenue address, she agreed to drive her to Hampton and Baxter Streets, where she waited in the car for her. When Valencia returned, Bedoya drove her to the Republic National Bank, where she acted as Valencia's interpreter to purchase three money orders. The women then ate lunch, returned to Corona Avenue, paid the rent at that apartment, and then they drove to the 35th Street apartment.

Recounting a somewhat different sequence, Bedoya stated that when she and Valencia entered 31–24 35th Street they were informed that the superintendent was not there, so "[they]" paid the rent to a woman on the first floor and were told to wait for the superintendent. They then went to apartment 3B, where according to Bedoya, the disorder and the scales in the kitchen made her nervous. She stated that because she was nervous she remained in the bedroom almost the entire time she and Valencia were in the apartment. Bedoya related that the women left the apartment, went to the grocery store and then were stopped by the agents. She admitted lying to the agents, but said that she would not

have accompanied Valencia if she had known there was cocaine at 31–24 35th Street. She testified that she never possessed cocaine and did not intend to offer any assistance to anyone in distributing cocaine, and also that she did not place the bag of cocaine in the back of her car.

On cross-examination, Bedoya was asked whether she had driven any car other than her Ford during April or May of 1983, and specifically if she had ever rented a car from Transnational Car Rentals, or had driven a car that she knew was from that agency. She answered these questions in the negative.

### (4) *The Government's Rebuttal Case*

The government, over objection by defense counsel, presented two witnesses in its rebuttal case. The first, Officer Thomas Healy of the New York City Police Department, testified that on the evening of April 25, 1983, he had observed Bedoya driving a 1979 white Dodge automobile, which he later learned was registered to Transnational Car Rentals. The second witness, the vice president and general manager of Transnational Car Rentals, testified that the 1979 Dodge was, on April 25, 1983, under a rental contract to one Jorge Lopez, and that the address provided by Lopez was 88–25 Corona Avenue Queens, New York—Valencia's address. The government did not introduce any evidence that Bedoya herself had rented cars from the agency.

### (5) *Jury Deliberations and the Verdict*

The jury sent out three notes during their deliberations, requesting clarification on the conspiracy jury charge and requesting all of Martha Bedoya's testimony.

The jury found Bedoya guilty of the conspiracy count, and acquitted her on the substantive count; Valencia was convicted of both counts of the indictment. Bedoya was sentenced to a term of one year and a day, and Valencia was sentenced to concurrent terms of seven years' imprisonment on each count and a concurrent special parole

term of ten years on Count Two. This appeal followed.

## II. DISCUSSION

### A. *THE MOTION TO SUPPRESS*

Appellants contend: (1) that both the investigatory stop on 35th Street and the search of apartment 3B violated their fourth amendment rights; (2) that therefore their arrests were unlawful since they were largely based upon tainted physical evidence discovered in apartment 3B; and, (3) that the taint extended to the cocaine found in the back of Bedoya's automobile. Valencia and Bedoya assert that the district court improperly denied their motions to suppress the cocaine and drug paraphernalia seized from apartment 3B as well as the cocaine seized from Bedoya's automobile.

It is the well-established rule in this circuit that a warrantless investigatory stop is justified if the law enforcement officers are aware of "specific and articulable facts" giving rise to a reasonable suspicion that the individuals to be stopped are engaged in criminal activity. *United States v. Forero-Rincon*, 626 F.2d 218, 221 (2d Cir.1980); *accord United States v. Gomez*, 633 F.2d 999, 1004 (2d Cir.1980) ("An officer need have only a reasonable suspicion that criminal activity is afoot before subjecting a person to an investigatory stop."), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981). In considering whether the facts and inferences support a reasonable suspicion, the law enforcement agent's observations "must be viewed as a whole, not as discrete and separate facts." *Forero-Rincon*, 626 F.2d at 221. "[T]he agent's suspicion will be reasonable if the conduct ... would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer." *United States v. Ramirez-Cifuentes*, 682 F.2d 337, 342 (2d Cir.1982) (citation omitted). Finally, in determining the propriety of a particular encounter, the totality of the circumstances must be considered, *United States v. Cortez*, 449 U.S. 411, 417, 101

S.Ct. 690, 694, 66 L.Ed.2d 621 (1981), including the duration and intrusiveness of the search, *see Dunaway v. New York,* 442 U.S. 200, 209, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979).

■ Viewing the facts herein as a whole, as well as the rational inferences to be drawn therefrom, we agree with Judge Nickerson that the Task Force agents' suspicions were reasonable and that the initial investigatory stop was justified. The agents had conducted an investigation of apartment 3B at 31–24 35th Street for almost a year, based on information that it was a stash pad for the Sepulveda organization. Although the agents could not look into the apartment because the windows were boarded, they learned through their investigation that mail for the apartment was not picked up, that people came and went for short periods of time late at night, and that the electricity in the apartment was not turned on.

In addition, in January of 1983, furniture was removed from the 35th Street building to an apartment in Bayside Queens, where Paco Sepulveda was subsequently arrested. On May 4, 1983, the agents observed Valencia, whom they knew to be Paco's sister-in-law, and Bedoya enter 31–24 35th Street and remain inside for approximately thirty minutes. When she and Bedoya left the building they appeared to do so cautiously, looking up and down the block before proceeding onto the street. *Cf. Ramirez-Cifuentes,* 682 F.2d at 342 (suspect's "nervous demeanor and her constant glancing about" considered important ·in assessing reasonable suspicion); *United States v. Vasquez-Santiago,* 602 F.2d 1069, 1072 (2d Cir.1979) (per curiam) (same), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980). We conclude that there were sufficient articulable facts to justify the agents' suspicions that criminal activity was afoot, especially where, as here, "the serious nature of cocaine trafficking and imminent departure of the suspected courier ... augment[ed] the need for a stop." *Ramirez-Cifuentes,* 682 F.2d at 343.

Furthermore, the intrusiveness of the subject stop was minimal. It lasted only ten to fifteen minutes and occurred in a public place. The agents did not exhibit their weapons or raise their voices. Appellants were not physically restrained, and there is no indication in the record that they were intimidated, harassed or humiliated by the agents. Accordingly, we conclude that the stop was reasonable.

As we have noted, appellants also challenge the denial of their suppression motions on the ground that they did not consent voluntarily to accompany the agents down the block to 31–24 35th Street, and that Valencia did not consent voluntarily to the search of apartment 3B. Rather, appellants assert that their consent was coerced and that they submitted to authority. The trial judge rejected these assertions.

■ For consent to a search to be valid, it must be voluntarily and freely given, and not the product of duress or coercion. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Sanchez,* 635 F.2d 47, 58 (2d Cir.1980). Whether appellants' consent herein was voluntary is a question of fact to be determined by the district court from the totality of all the circumstances. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047; *Sanchez,* 635 F.2d at 58. The district court's findings will not be reversed unless they are clearly erroneous. *United States v. Lace,* 669 F.2d 46, 52 (2d Cir.), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982).

■ After reviewing the record, we hold that Judge Nickerson's finding that appellants' consent was voluntary is not clearly erroneous. The Task Force agents spoke to appellants in conversational tones in both English and Spanish and no weapons were displayed at any time. Further, there is no persuasive record evidence that the agents forced or in any way threatened appellants in order to coerce their consent, or that appellants' wills were in any way overborne. Thus, we affirm the district court's findings that appellants voluntarily

consented to accompany the agents to the building at 31–24 35th Street, and that Valencia voluntarily consented to the search of apartment 3B. Finally, because we conclude that both the investigatory stop and the search of apartment 3B were constitutionally valid, we reject appellants' contention that the cocaine discovered in Bedoya's automobile was tainted by prior fourth amendment violations.

## B. SUFFICIENCY OF THE EVIDENCE

### (1) Count One

█ Appellants claim that there was insufficient evidence to support their conspiracy convictions. In considering such a claim, we must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *see United States v. Carson*, 702 F.2d 351, 361 (2d Cir.) ("Our inquiry is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt.") (citations omitted), *cert. denied*, —— U.S. ——, 103 S.Ct. 2456–57, 77 L.Ed.2d 1335 (1983). This standard places a heavy burden on a defendant advancing a claim based on insufficiency of the evidence. *Id.; United States v. Losada*, 674 F.2d 167, 173 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Nevertheless, we believe that appellant Bedoya has sustained her burden with respect to her conspiracy conviction.

█ We recognize, of course, that "[a] conspiracy by its very nature is a secretive operation," *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980), and that the *"[e]xistence* of and participation in a conspiracy ... may be established ... through circumstantial evidence." *United States v. Sanzo*, 673 F.2d 64, 69 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111

(1982) (emphasis added). However, there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it. *United States v. Soto*, 716 F.2d 989, 991 (2d Cir.1983). Further, "'[w]here the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute[s].'" *Soto*, 716 F.2d at 993 (quoting *United States v. Cangiano*, 491 F.2d 906, 909 (2d Cir.), *cert. denied*, 419 U.S. 904, 95 S.Ct. 204, 42 L.Ed.2d 162 (1974)).

Herein, Bedoya was charged with conspiring with Valencia to distribute and to possess with intent to distribute cocaine. The circumstances relied upon by the government to support the jury's finding of guilt against Bedoya are as follows: Bedoya knew Valencia, and on May 4, 1983, Bedoya drove Valencia to apartment 3B at 31–24 35th Street, which Task Force agents had staked out as a stash pad. The appellants were observed entering the building together and then leaving in a "suspicious" manner. When stopped by the agents, Bedoya lied about her presence in the apartment building. She and Valencia subsequently led the agents to apartment 3B, where cocaine was discovered. In addition, fresh cocaine residue was found in a small strainer in the kitchen of the apartment. After Bedoya was placed under arrest, a plastic bag containing a white powder (later found to be seven grams of cocaine) was found on the rear floor of her automobile on the passenger's side. When Bedoya was shown the bag and informed that her car would be seized, she responded that "the cocaine wasn't found on my side of the car, was it?" Finally, during its rebuttal case the government introduced evidence for the purpose of showing that Bedoya had lied on cross-examination when she denied having driven a rented car during April of 1983.

■ These facts, the government argues, constitute sufficient circumstantial evidence from which the jury could infer the existence of a conspiracy and Bedoya's membership in it. We do not agree. It is our view that the evidence adduced at trial failed to demonstrate that Bedoya knew of the existence of the conspiracy charged and knowingly participated in it. Her presence in apartment 3B, even coupled with her knowledge that Paco Sepulveda was engaged in the sale of narcotics, is not sufficient to establish her knowing membership in the alleged conspiracy. *See, e.g., Soto,* 716 F.2d at 991 (defendant's "sustained and regular presence" in apartment in which guns and narcotics were found was insufficient by itself to sustain conspiracy conviction); *United States v. Johnson,* 513 F.2d 819, 823–24 (2d Cir.1975) ("[a]bsent evidence of ... purposeful behavior [to further the alleged conspiracy], mere presence at the scene of a crime, even coupled with knowledge that at that moment a crime is being committed, is insufficient to prove ... membership in a conspiracy"). Bedoya's association with Valencia and her presence in the car rented to Jorge Lopez at best show contact with drug traffickers, which alone, is insufficient to prove participation in a conspiracy. *Johnson,* 513 F.2d at 824 ("[g]uilt may not be inferred from mere association with a guilty party"). As to Bedoya's admitted lie to the agents about being in 31-24 35th Street, we reiterate our position in *United States v. Johnson, supra:*

> While false exculpatory statements made to law enforcement officials are circumstantial evidence of a consciousness of guilt and have independent probative force, *United States v. Parness,* 503 F.2d 430, 438 (2 Cir.1974); *United States v. Lacey,* 459 F.2d 86, 89 (2 Cir.1972), this Circuit in *United States v. Kearse,* 444 F.2d 62 (2 Cir.1971), and *United States v. McConney,* 329 F.2d 467, 470 (2 Cir. 1964), has held that falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak

and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt.

513 F.2d at 824.

■ Finally, as for the seven grams of cocaine found in Bedoya's car on the back floor, passenger's side, we note that the evidence introduced at trial—including the Task Force agents' testimony on cross-examination that although they looked, they did not observe any cocaine on the back floor of the car when they initially stopped appellants, and that they observed Bedoya during the entire period she remained in the car—raises substantial doubt that it was Bedoya who placed the cocaine in the car. In addition, even if that evidence was otherwise sufficient to support a conviction on a possession charge, the quantity of cocaine seized from the car does not establish beyond a reasonable doubt that Bedoya had the specific intent to distribute cocaine. *Cf. Turner v. United States,* 396 U.S. 398, 422–23, 90 S.Ct. 642, 655, 24 L.Ed.2d 610 (1970) (defendant's bare possession of 14.68 grams of a cocaine and sugar mixture does not establish that he was distributing the drug). As noted above, proof of a specific intention by Bedoya to violate the substantive statute—that is, to possess cocaine with intent to distribute it—is essential to sustain the conspiracy conviction herein. *See Soto,* 716 F.2d at 993.

■ In conclusion, "while the evidence need not have excluded every possible hypothesis of innocence," *id.,* we hold that the evidence relied upon by the government, when viewed as a whole, failed to demonstrate that Bedoya knowingly participated in the conspiracy charged.

■ While we have limited our analysis to Bedoya's conspiracy conviction, our reversal of that conviction affects Valencia as well. Under the bilateral approach to conspiracy followed by the federal courts, *see United States v. Rosenblatt,* 554 F.2d 36, 38 n. 2 (2d Cir.1977), "unless at least two people commit the act of agreeing, no one does." *United States v. Harris,* 733

F.2d 994, 1006 (2d Cir.1984). The indictment herein charged a conspiracy only between two people—Valencia and Bedoya—and did not allege that the defendants conspired with any other persons. Thus, since it is fundamental that there must be at least two parties to such an agreement, and since we reverse Bedoya's conspiracy conviction, we must also reverse Valencia's conviction on Count One.

(2) *Count Two*

██ Valencia further contends that there was insufficient evidence to support her conviction for possession with intent to distribute cocaine. We reject Valencia's claim of insufficient evidence as to Count Two. Viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we conclude that the evidence amply supports the jury's verdict.

At trial, the jury heard testimony that apartment 3B on 35th Street was a stash pad from which almost one and one half pounds of cocaine was seized; that the lease to that apartment was in Valencia's name; that she possessed the keys to the apartment; that there were women's clothes in the closet of the apartment; and that a key from Valencia's key ring opened a metal box found therein which contained a substantial quantity of cocaine. In view of this and the other evidence recited hereinabove, the jury could certainly have concluded that Valencia had the dominion and control necessary to possess the narcotics in apartment 3B. *See United States v. Littrell,* 574 F.2d 828, 835 (5th Cir.1978) (constructive possession, which may be shown by dominion and control, is sufficient to support conviction). Moreover, given the quantity of cocaine discovered in the apartment—almost one and one half pounds (approximately 681 grams) varying in purity from 51.7 to 94.2 percent—the jury could reasonably infer an intent to distribute. *See United States v. Grayson,* 625 F.2d 66, 66–67 (5th Cir.1980) (intent to distribute controlled substance may be in-

ferred solely from possession of a large quantity—413.1 grams of dilute cocaine hydrochloride—of the substance). Accordingly, we affirm Valencia's conviction on Count Two.

C. *DEFENDANTS' OTHER CONTENTIONS*

Because we reverse appellants' convictions on Count One, we need not address their contentions (1) that the district court improperly denied their Rule 29 motions as to the conspiracy charge and (2) that the district court erred by permitting the government to present its rebuttal case against Bedoya.

### III. CONCLUSION

For the foregoing reasons, appellants' convictions on Count One are reversed and dismissed, and Valencia's conviction on Count Two is affirmed.