**UNITED STATES of America,**

v.

**Angel BETANCOURT and Ronald Brown, Defendants.**

**No. S 84 Crim. 353 (WCC).**

United States District Court,
S.D. New York.

Oct. 5, 1984.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for the U.S.; Arthur W. Mercado, Asst. U.S. Atty., New York City, of counsel.

Lynne F. Stewart, New York City, for defendant Betancourt.

Kriss & Vecchione, New York City, for defendant Brown; Arnold N. Kriss, New York City, of counsel.

## OPINION

CONNER, District Judge:

This criminal case, in which defendants Angel Betancourt and Ronald Brown were charged with conspiracy to distribute codeine, distribution of codeine and possession of codeine with intent to distribute it, was tried by the Court without a jury on September 10 and 11, 1984. This Opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rule 23(c), F.R.Crim.P.[1]

### THE UNDISPUTED FACTS

The uncontradicted testimony establishes the following facts:

On May 29, 1984, Officer Rodney White of the New York Police Department and a backup team were engaged in a "buy and bust" operation on the lower East Side of Manhattan. White, acting in an undercover capacity as a heroin purchaser, and accompanied by a second undercover officer, went to the corner of East 11th Street and Avenue B where they saw defendant Brown rounding the corner. Because Brown looked "street wise," White ap-

---

1. Although Rule 23(c) does not require that the Court in a non-jury case enter special findings of fact except when requested to do so, and although there was no such request in this case, the Court feels that, because of the unusual legal questions presented here, a detailed discussion of the basis for the Court's general findings is in order.

proached him and asked him where he could buy some "D" (heroin). Brown said that he had none to sell but could take White to someone who was dealing. Brown led the two undercover officers two blocks up Avenue B to the corner of East 13th Street. There Brown pointed to defendant Betancourt and said "There's my man." Brown thereupon left the two officers, walked over to Betancourt and talked with him briefly. Brown then returned to the officers and told White to go over to Betancourt.

White did so and asked Betancourt for a "bundle" (ten "dime" glassine bags normally retailing for $10 each). Betancourt replied that this would cost White $100. White thereupon handed Betancourt $100 in pre-recorded currency and received in exchange ten glassine envelopes containing a white powder.

After the transaction, Brown and the two officers walked back down Avenue B toward 12th Street. En route, White signalled to a member of the backup team, who had been conducting surveillance, that the "buy" had been completed. Before they parted, Brown told White that he had no money and White handed him a $1 bill.

Betancourt followed Brown down Avenue B and, after Brown left the officers, Betancourt joined him and the two went into an abandoned building. Shortly thereafter they emerged and walked together on East 11th Street where they were arrested by Police Officers Fitzpatrick and Morsoni of the backup team, acting on the basis of a report of the transaction and descriptions of the perpetrators which they had received by radio.

When the defendants were searched incident to the arrest, Betancourt was found to have in his possession the $100 in pre-recorded currency, and Brown had a single glassine bag containing a white powder.

The ten glassine bags purchased from Betancourt and the single glassine bag found in Brown's possession at the time of the arrest all bore the stamp "DD" in red ink. Subsequent laboratory tests of the powder contained in all eleven of the bags showed that each contained a mixture of codeine, aspirin and thorazine, with no caffeine present.

Betancourt testified that the white powder he had delivered to the undercover officer and to Brown had been prepared by him by crushing some aspirin tablets which he had purchased in a Canadian pharmacy several years earlier. He added that the aspirin bore the brand name "222" and had been selected by him off a self-service shelf in a section marked "Aspirin." He said he did not know that this product contained codeine.

In rebuttal, the Government called Dr. John Stanley Weyman, a physician employed by Merck, Sharp and Dohme, the parent company of the maker of 222, who testified that 222 contains codeine, aspirin and caffeine.

## DISCUSSION

### Count One—Conspiracy to Distribute Codeine

In Count One, the two defendants are charged with conspiracy to distribute codeine. It is undisputed that Betancourt sold a powdered substance containing codeine to an undercover officer who had been brought to him by Brown. But Betancourt contends that he did not know the material contained codeine—that, in order to get money to support his own habit, he was attempting to sell ordinary aspirin to someone who thought he was getting heroin. Brown contends that he also thought that heroin was being sold, so that he had no meeting of minds with Betancourt, as required for the crime of conspiracy. And both Brown and Betancourt contend that although they had known one another for some time, there was no ongoing business relation between them, and no advance plans for the sale involved in this case.

But an illegal conspiracy may have as its objective only a single sale of a controlled substance, see *Callanan v. United States*, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961), and its formation may

immediately precede the sale. Here there is no reasonable doubt that Brown approached Betancourt and arranged for White to purchase from Betancourt a substance which contained codeine. As discussed hereinafter, the fact that Brown thought that heroin, rather than codeine, was being sold would not exculpate him from the substantive offense of aiding and abetting the distribution of codeine.

■ But conspiracy requires a meeting of minds. *United States v. Gaviria*, 740 F.2d 174 at 184 (2d Cir.1984) ("act of agreeing" required). The Government has not proven beyond a reasonable doubt that Brown knew that what Betancourt proposed to sell was not heroin but a mixture containing codeine. Quite the contrary, the fact that at the time of his arrest Brown had in his possession a glassine bag containing the same mixture which he apparently had either bought from Betancourt or had accepted as his compensation for introducing a customer to Betancourt strongly suggests that Brown thought the material was heroin. There is simply no reason to believe that Brown knowingly entered into a conspiracy for the sale of codeine.

The Government concededly knows of no prior case, and we are aware of none, in which there was a conviction for conspiracy to sell drugs in which the two alleged conspirators thought that different controlled substances would be sold. Absent such a precedent, this Court is not persuaded that the offense of Conspiracy charged in Count One has been proven.

*Count Two—Distribution of Codeine*

■ Count Two charges both defendants with the substantive offense of distributing codeine. As already noted, the evidence establishes beyond a reasonable doubt that Betancourt sold a powdered mixture containing codeine. He insisted that he thought it was ordinary aspirin, but that testimony was not credible. In the first place, it strains credulity to assume that, purely by chance, the aspirin tablets which he pulverized and attempted to pass off as heroin were purchased in Canada and contained codeine (which may be sold there

without a prescription) and thus were more likely to deceive an unsuspecting user than ordinary aspirin. In the second place, Dr. Weyman, who is licensed to practice medicine in Canada, testified that, contrary to Betancourt's story, aspirin-codeine mixtures such as 222 are not available on the self-service shelves of Canadian pharmacies, but can be purchased only on request to the pharmacist. Finally, laboratory analysis showed that the material sold by Betancourt was not 222, as Betancourt claimed. It contained thorazine, which "222" does not, and it did not contain caffeine, as "222" does. The conclusion is virtually inescapable that Betancourt was knowingly selling a material containing codeine.

There was evidence that codeine gives the user a "high" similar to but less intense than that produced by heroin. Anyone attempting to pass off a powdered material as heroin would surely tend to believe that his chances of succeeding in the deception would be vastly better if he sold a mixture of codeine and aspirin than if he sold pure aspirin. Thus the reasonable inference is that Betancourt acquired the 222 for the very reason that it contained codeine and could more easily be passed off as heroin or even used by himself as an emergency substitute when heroin was not available.

The Court therefore finds that the Government has proven beyond a reasonable doubt that Betancourt knowingly and willfully sold codeine, in violation of 21 U.S.C. § 841(a)(1), as charged in Count 2.

■ As discussed above, the undisputed evidence establishes that Brown assisted Betancourt in the sale by taking White to Betancourt and arranging for the two to meet for that purpose. There is no reasonable doubt that Brown knowingly and willfully aided and abetted Betancourt's sale of a controlled substance. That Brown believed the material sold was heroin, whereas it was actually codeine, another controlled substance, is immaterial.

It is well settled that one who sells a controlled substance mistakenly believing that he is selling a different controlled substance is nonetheless guilty of the substantive offense of distributing the controlled substance he actually sells. *United States v. Morales,* 577 F.2d 769, 776 (2d Cir.1978); *United States v. Jewell,* 532 F.2d 697, 698 (9th Cir.) (*en banc*) *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). There is no reason why this rule should not extend to one who willfully aids and abets the sale of a controlled substance thinking that a different controlled substance is being sold.

The Court accordingly concludes that Brown is guilty, as an aider and abetter, of the substantive offense of distributing codeine under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, as charged in Count Two.

*Count Three—Possession with Intent to Distribute Codeine*

Count Three charges only defendant Brown with possession of one glassine envelope of codeine with intent to distribute it.

There is no evidence whatever that Brown intended to distribute the single "dime" bag of aspirin-codeine-thorazine mixture he had in his possession at the time of his arrest. Quite the contrary, the inference seems virtually inescapable that Brown, a heroin addict, had either purchased the material from Betancourt or received it as payment for his introduction of a customer to Betancourt and intended to use it himself, believing it was heroin.

The Court accordingly finds that the Government has not established beyond a reasonable doubt Brown's guilt of the offense charged in Count Three.

### SUMMARY

Betancourt is not guilty of the offense charged in Count One and is guilty of the offense charged in Count Two.

Brown is not guilty of the offenses charged in Count One and Count Three and is guilty of the offense charged in Count Two.