UNITED STATES of America, Appellant–Cross–Appellee,

v.

Wendy Lynn MORGAN, Defendant– Appellee–Cross–Appellant.

Docket No. 02–1758.

United States Court of Appeals, Second Circuit.

Argued: Dec. 5, 2003.

Final Submission: May 3, 2004.

Decided: Sept. 28, 2004.

Samantha L. Schreiber, Assistant United States Attorney for the Eastern District of New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, David C. James, Assistant United States Attorney, of coun-

sel), Brooklyn, NY, for Appellant–Cross–Appellee.

Benjamin E. Rosenberg, Swidler, Berlin, Shereff & Friedman LLP, New York, NY, for Defendant–Appellee–Cross–Appellant.

Before: CARDAMONE, SACK, and JOHN R. GIBSON,* Circuit Judges.

SACK, Circuit Judge.

Appeal by the defendant Wendy Lynn Morgan[1] from a judgment of conviction following a jury trial in the United States District Court for the Eastern District of New York (David G. Trager, *Judge* ). The jury found Morgan guilty of conspiracy to import, importation, and possession with the intent to distribute controlled substances in violation of 21 U.S.C. §§ 963, 952(a), and 841(a)(1), respectively. Morgan argues that the evidence at trial was insufficient to establish that she knowingly and intentionally committed the offense. She further argues that the letter written by her co-defendant, Lori Hester, to Hester's boyfriend was improperly admitted hearsay with respect to the case against Morgan and that the district court therefore committed plain error by failing to instruct the jury not to consider it with respect to the charges against her. Because we conclude that the evidence was sufficient for conviction and that failure to give the instruction was not plain error, we affirm the judgment of the district court.

## BACKGROUND

In setting forth the facts of this case, we are required to view all trial evidence in the light most favorable to the government; all permissible inferences must be drawn in its favor. *United States v. Martinez,* 54 F.3d 1040, 1042 (2d Cir.1995), *cert. denied,* 516 U.S. 1001, 116 S.Ct. 545, 133 L.Ed.2d 448 (1995). The facts of this case were elicited by the government largely from the testimony of Hester and the testimony of a United States customs inspector and a New York City police detective as to what Morgan said to each of them at or about the time of her arrest. Because the principal question before us is the sufficiency of the evidence at trial used to convict Morgan, we rehearse the testimony here in some detail.

Hester and Morgan were residents of Clarkesville, Georgia, a small town some eighty miles northeast of Atlanta. At the time of the trial that is the subject of this appeal, according to Hester, the two women were, and for some years previously had been, "best friends."[2] Trial Tr., Jan. 11, 2001, at 183.

During the winter of 1999–2000, Morgan and Hester were befriended by a man named Kareem Scott. According to Hester, Scott drove a white Mercedes Benz and told them that he worked in the fashion business, "with clothes and stuff." *Id.* at 187. Neither Morgan nor Hester knew where Scott lived or had a means of reaching him other than by leaving a call-back number on his pager. The two young women met with Scott some seven or eight times during that period.

In May 2000, Scott invited Hester and Morgan to accompany him to New York City "because," Hester said, "he didn't want to go by himself." *Id.* at 188. After deliberating for several weeks, the two

---

* The Honorable John R. Gibson of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. The government has withdrawn its appeal, but continues to be listed as "appellant" in the official caption in this Court.

2. Morgan and Hester were tried together. Hester testified at trial; Morgan did not.

women accepted Scott's offer. Days later, using plane tickets and $300 in cash given to them by a woman whom Scott described as his cousin, they flew to New York.

Scott met them in New York City, although he left a few days later to travel to Miami "on business." *Id.* at 190. According to Hester, while they were in New York, they were taken to a passport office by someone introduced to them by Scott. The reason Scott gave them was that "he didn't know where [they] might be going in a future trip, may be going overseas." *Id.* at 229. The women's efforts to obtain passports were unsuccessful, however, because Morgan did not have the required documentation with her. Shortly thereafter, the two women returned to Georgia.

According to Hester, about a week after returning home, she received a telephone call from Scott. Scott asked that Morgan and Hester "pick up some clothes" in Paris for him. *Id.* at 191. He offered not only to pay for the trip but also to pay them an unstated fee for their efforts. Hester testified that she thought that the trip involved "some kind of work" for Scott and agreed that Scott's offer was thus a "business proposition." *Id.* at 234. After the women accepted Scott's offer, he took them to Atlanta, where the women each succeeded in obtaining a passport.

On June 9, 2000, the day after they received their passports, Morgan and Hester again flew to New York. They brought with them a small blue duffle bag and had instructions to go to a Days Inn in Manhattan when they arrived. There, they would be met by a friend of Scott named "Dustin."

Morgan and Hester did as they were told. At or about nine or ten o'clock on the evening that they arrived in New York, after they had checked into the Days Inn, a man telephoned them. He referred to himself as Dustin. According to Hes-

ter, Morgan took the call. Dustin asked Morgan to come down to meet him, which she did. She returned to her room some five or ten minutes later with $1,000 in hundred dollar bills. It was, Hester said, for "spending money and stuff like that." *Id.* at 194.

The following day, June 10, Dustin returned to the hotel with airline tickets to Paris for Morgan and Hester. They were to depart that night.

During their two-day New York sojourn, Morgan and Hester bought souvenirs—including New York Police Department teddy bears, crossword-puzzle books, New York T-shirts, and New York Yankees hats—and a black bag in which to carry them.

As Morgan and Hester's departure time neared, Dustin picked them up at their hotel and drove them to the airport. He told them that they were going to Paris to pick up clothes. According to New York City Police Department Detective Lorraine Green, who interviewed Morgan at the time of her later arrest, Morgan said that when she was leaving for Paris, she had asked Dustin "straight up" if they were really going to pick up clothes, "because she didn't want to do anything illegal." Trial Tr., Jan. 10, 2001, at 119. Dustin reassured her that, yes, they were just going to pick up clothes.

The two women took the black bag of souvenirs with them to Paris as carry-on luggage. They checked the blue duffel bag with their clothes in it.

The instructions the two women received regarding what to do when they arrived in Paris were as vague as those they had been given for their arrival in New York. According to Hester, Dustin told the defendants that upon arriving at the Paris airport, they might be met by a friend of his; if not, they should call Scott,

who would give them the friend's phone number. They never asked for or were told this man's name.

When Morgan and Hester arrived in Paris, after a stop in London, they were paged on the public address system to a service desk. There they were told, apparently by a representative of the airline on which they had traveled, that the checked blue duffle bag had been misplaced. They were instructed how to retrieve it when they returned to the United States.

Shortly thereafter, they were paged to the service desk again. The unnamed friend of Scott and Dustin was there to meet them.[3] He told Morgan and Hester that the three of them would be traveling together to the Netherlands. According to Hester, he said he lived there and that there, and not Paris, was "where the clothes [we]re." Trial Tr., Jan. 11, 2001, at 198. The three then flew to Amsterdam.

Once in Amsterdam, the man gave the two women $600 in local currency. He then dropped them off at a hotel for the night.

According to Hester's story, the following day, the man picked up the women at the hotel. The three drove to another city in the Netherlands—Hester did not know which—and there, Morgan and Hester were deposited at a Holiday Inn. How long they were to stay there they were not told.

The man called to check up on the women regularly during their stay. Meanwhile, Hester and Morgan, having been deprived of the use of the clothing in the lost blue duffel bag, each bought a new outfit for her personal use.

According to Hester's account, on June 13, 2000, the still-nameless man picked them up at the Holiday Inn. He took their black carry-on bag, which contained the New York souvenirs and the clothes they had worn on their trip. He instructed the women to go across the street to get something to eat, which they did. Some forty-five minutes later, the man returned, handed Morgan and Hester return airline tickets to New York that had been purchased that day, and drove them to the Amsterdam airport for their return to New York.

When the threesome arrived at the airport, the man unloaded three pieces of luggage from the trunk of the car in which they had been driving. Morgan told the officials at the time of her arrest and Hester testified at trial that they had not seen the luggage before. Hester testified that when one of the women asked the man where their black carry-on bag was, he informed them that he had put it in one of the pieces of luggage "with the clothes." *Id.* at 208. According to their story, neither Morgan nor Hester ever looked inside the luggage, not even to determine whether, in fact, their black carry-on bag or their clothing was there.

Before entering the airport building, the man told Morgan and Hester each to stand in a different line when they got to U.S. customs and, if asked, to say that they had been in Holland for two weeks and that their tickets had expired. Neither woman questioned his instructions.[4] He also gave the defendants two similar rings that they were to give to Dustin when they arrived in New York. The man then carried the three pieces of luggage to the airline coun-

**3.** So far as we can tell from the record, Scott, Dustin, Scott's cousin, the person in New York who helped the women seek passports, and the European "friend" have never been located or prosecuted.

**4.** According to Detective Green, Morgan stated during her interview in New York that she asked the man if there were clothes in the bag, to which he replied in the affirmative.

ter, where the women proceeded to check in for the flight back to the United States.

All three baggage claim-checks were given to Hester and recorded under her name because, as Hester explained, "they checked [her] in first." *Id.* at 210. According to Hester, neither woman handled the luggage while in Amsterdam, nor were either of them asked any then-routine security questions during check-in, such as whether they had packed the bags themselves or whether the luggage had been in their possession at all times since being packed. Hester and Morgan contend that they believed, as Hester testified they had been told, that the luggage contained clothes.

The defendants flew from Amsterdam to Reykjavik, Iceland, where they caught a connecting flight to John F. Kennedy International Airport in New York. When they arrived, the defendants themselves hoisted the three pieces of luggage off the carousel and placed them on a baggage cart. Hester testified that neither woman was suspicious about the heaviness of the luggage, although each piece weighed more than forty pounds. According to Hester, the pieces of luggage were similar to the blue duffle bag that had been misplaced en route to Paris, which was "heavy, because [they] had packed so many clothes in it." *Id.* at 211.

Contrary to the instructions they had been given at the Amsterdam airport, the two women attempted to transit customs at JFK Airport together. They were sent to a secondary inspection station, where Customs Inspector Kristen Tursellino was on duty. Tursellino testified at trial that a "lookout" was placed on Hester in part because her passport was newly issued. Tursellino reviewed the defendants' customs forms, on which both women indicated that their trip had been for personal, rather than business, purposes, that the total value of all goods purchased while abroad was $55, and that the purchased goods included only a skirt and a shirt. Tursellino testified that when she asked the two women questions, Hester did most of the talking, while Morgan nodded her head in assent. According to Tursellino, one of the defendants answered that all three pieces of luggage belonged to both of them, that "[t]hey lived together and packed all their things together," and that everything in the luggage belonged to both of them. Trial Tr., Jan. 10, 2001, at 49. Tursellino could not recall with respect to this specific exchange "which one spoke and which one nodded." *Id.* at 50. She was confident, however, that "they both claimed ownership of the bags." *Id.* at 50–51.

Tursellino asked Morgan and Hester to place one of the pieces of luggage on the counter. According to Hester, "[she and Morgan] grabbed one of the bags off the top." Trial Tr., Jan. 11, 2001, at 212. According to Tursellino, Tursellino then began looking through it. She soon came upon a large box wrapped in wrapping paper. According to Tursellino, she asked what was inside the box. One of the women, she thought it was Hester, answered that the box contained toys bought in New York. Tursellino then reiterated her question, asking the women if they had bought these toys in New York before taking their trip abroad. The same woman, presumably Hester, answered yes, and the other woman nodded. Tursellino then unwrapped the box. It was, in fact, a box that contained a bag of toys. The toys were not, however, the New York-bought teddy bears that the women had taken to Paris with them, which were still in the black bag inside the luggage.

In the box, beneath the bag that contained the toys, were two large bags, each containing many thousands of white pills.

It was later determined that the pills were the drug MDA,[5] a synthetic drug similar to "ecstasy." They were imprinted with the brand logo "Mitsubishi." According to Tursellino, Morgan "didn't appear to have any reaction [when the drugs were discovered;] she stood and didn't say anything." Trial Tr., Jan. 10, 2001, at 91.

Each of the three pieces of luggage contained two such wrapped boxes which in turn contained toys and large bags of MDA. The combined weight of the MDA in the three bags exceeded seventy-one pounds. It was stipulated at trial that the wholesale value of the MDA in the New York City area in June 2000 was over one million dollars.

Hester testified that she had misunderstood the Inspector's question. According to her trial testimony, when Tursellino asked her what was inside the first piece of luggage, she saw the strap of the carry-on bag within it, which she thought still contained the New York souvenirs. She testified that she therefore answered that the bag contained "some toys and shirts and things" in reference to the contents of the carry-on bag, not the wrapped box. Trial Tr., Jan. 11, 2001, at 213. Hester testified that when she said "toys," she was referring to the New York Police Department teddy bears that she and Morgan had purchased before leaving New York. According to Hester, neither she nor Morgan had seen the wrapped boxes of toys before.

On cross-examination, Tursellino reiterated that she was holding the wrapped box in her hands when she asked the defendants what was inside the box.

When the MDA was discovered, Hester and Morgan were each led into a separate search room. Detective Green then interviewed them. Green testified that when she first encountered Morgan, she was "crying hysterically," making it useless for Green to start asking her questions. *Id.* at 159. Hester was calm, so Green read her her *Miranda* rights and interrogated her first. Green then returned to Morgan, whose crying had apparently subsided, read her her rights, and asked her questions. Green asked Morgan what was in the luggage, to which, according to Green, Morgan replied that she "didn't have a clue." Trial Tr., Jan. 10, 2001, at 110. Green asked who was waiting outside for them, to which Morgan replied, "Dustin." While Morgan was still in the search room, she asked Customs Inspector John Hollywood what was seized in the three pieces of luggage. When he answered that it was "ecstasy," Morgan asked him, "[W]hat's Ecstasy?" Trial Tr., Jan. 11, 2001, at 260. He explained that it was a narcotic or a drug.

Soon thereafter, both defendants were transferred to a central processing office, where Green continued the interviews, this time beginning with Morgan. Morgan had again begun to cry. In the course of the interview, according to Green's testimony, Morgan recapped her travel itinerary of the prior months: Morgan said that Scott had paid for everything, that she and Hester had come to New York at the end of May, where they had tried to get pass-

---

5. Technically, "3,4–Methylenedioxyamphetamine." *See* http://www.rhodium.ws/chemistry/mda.dalcason.html. The prosecution apparently misspoke occasionally during the trial, referring to the drug as "MDMA," which is "ecstasy," *see, e.g.,* Trial Tr., Jan. 10, 2001, at 57, but the pills were in fact MDA, *see* Superseding Indictment dated December 27, 2000 (referring to the drug as "MDA, a Schedule I controlled substance"); Trial Tr., Jan. 10, 2001, at 22 (where, during its opening statement to the jury, the prosecutor referred to the drug as MDA). We understand from the record that MDA is similar to but not the same as "ecstasy."

ports, that they had returned to New York, where they had stayed at the Holiday Inn (in fact, a Days Inn), that they had flown from New York to Paris via London, and that they had flown from Paris to the Netherlands, where they had received return tickets for New York. Morgan told Green that Morgan and Hester had received $1,000 from Dustin, whom Morgan called "D," and that Dustin had brought them their plane tickets to Paris. She explained that a man who looked like Dustin, a friend of Scott and Dustin, had met them in Paris, flown with them to the Netherlands, given them $600, given them three pieces of luggage that he had told them contained clothes, and provided them with return tickets to New York. She also explained that the friend had given Hester and her each a ring to give to Dustin when they arrived at the airport in New York. According to Green, Morgan stated that she had asked the friend if there were clothes in the bag because she "didn't want to get into trouble," and the friend had answered that there were. Trial Tr., Jan. 10, 2001, at 115.

Green testified that she came away with the impression that Morgan was of "[l]ow intelligence," Trial Tr., Jan. 11, 2001, at 161, and "wasn't telling [Green] everything she [Morgan] knew," *id.* at 162. "The impression," Green reiterated, "was [that Morgan] knew more than she was telling [Green]." *Id.* at 163.

The physical evidence admitted at trial included a spiral notebook belonging to Hester. In it, Hester had written several letters that she had not sent, including one to her boyfriend. That letter read in relevant part:

Friday, June 9th, 2000.

Ken,

Hey Boo, what's up? Nothing much here just sitting in the Hotel Room in New York. We fly to Paris tomorrow night at 9:00. I got your red New York hat, and we're gonna get your rum if everything goes right.

. . . I hope that we won't be gone but a couple days. . . .

When we got here yesterday one of the folks we're working for gave us a thousand dollars in 100 $ bills and told us to go have a good time. We're staying in Manhattan 6 blocks from times square. We just got back a little while ago. The city's so beautiful at night. . . . The way they're talking, when we get home we'll be able to get a car and a place of our own. I hope so, and, after them just handing over 1000 $ like that They just might be telling the truth. That's not counting the 5000 dollars they already spent on us in the last couple of weeks. . . .

. . . .

Love ya, Lori.

P.S. Wendy says hey!!

Duplicated in Joint Appendix on Appeal, at 10–11.

Hester testified that she "wasn't talking about a new car. [She] meant get the one [she and Morgan] already had, fixed, and rent [for her and Morgan] a little, cheap apartment, maybe in the vicinity of 800, 900 dollars altogether." Trial Tr., Jan. 11, 2001, at 218–19. Hester explained that she and Morgan arrived at the $5,000 figure by adding together the price of their tickets to New York and Paris, although the government pointed out that Dustin did not deliver the plane tickets to Paris until the day after the letter was written. The notebook also included a letter Hester wrote to her mother, in which she mentioned that she and Morgan were headed to Paris via London.

In its instructions to the jury, the district court gave a "conscious avoidance" charge, explaining to the members of the

jury that they "may consider whether the defendant deliberately closed her eyes to what would otherwise have been obvious to her. If you find beyond a reasonable doubt that a defendant acted with a conscious purpose to avoid learning the truth about what was hidden in her luggage, then this element may be satisfied." Jury Charge, Trial Tr., Jan. 12, 2001, at 355.

The jury returned a verdict of guilty on all counts against both defendants. The district court sentenced Morgan to fifteen months'. imprisonment followed by three years' supervised release, based on a substantial downward departure given to her by the district court. Morgan timely filed a notice of appeal, arguing that the evidence was insufficient to support her. conviction and, for the first time on appeal, that the letter written by Hester to her boyfriend was improperly admitted hearsay as against Morgan and that the jury should therefore have been instructed not to consider it with respect to the charges against her.[6]

## DISCUSSION

### I. Sufficiency of the Evidence

#### A. Standard of Review

■ "It is well settled that a defendant seeking to ' overturn a conviction based upon insufficiency of the evidence bears a heavy burden." *Martinez*, 54 F.3d at 1042 (internal citation and quotation marks omitted). "Not only must the evidence be viewed in the light most favorable to the government and all permissible inferences drawn in its favor," *id.*, but the conviction must be affirmed if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).

■ "The government's case need not exclude every possible hypothesis of innocence." *Martinez*, 54 F.3d at 1042–43 (citation and internal quotation marks omitted). While "a conviction based on speculation and surmise alone cannot stand," *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994), "the jury's verdict may be based entirely on circumstantial evidence," *Martinez*, 54 F.3d at 1043, and may be "inferred" from the evidence, *United States v. Ceballos*, 340 F.3d 115, 129 (2d Cir.2003), so long as the inference is reasonable; for "it is the task of the jury, not the court, to choose among competing inferences," *Martinez*, 54 F.3d at 1043 (citing *United States v. Stanley*, 928 F.2d 575, 577 (2d Cir.) *cert. denied*, 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991)). Thus, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir.2000) (citation, internal quotation marks, and alteration omitted).

In cases of conspiracy, deference to the jury's findings "is especially important ... because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992) (citation and internal quotation marks omitted).

#### B. Conspiracy

■ Morgan argues that "[t]he suspicious circumstances on which the govern-

---

**6.** Counsel for Morgan did ask that the court instruct the jury not to consider the letter with respect to the case against Morgan, but on .the grounds that its probative value was substantially outweighed by the danger of unfair prejudice and therefore inadmissible under Federal Rule of Evidence 403.

ment relied to make its case ... were insufficient to establish for a reasonable juror beyond a reasonable doubt that Morgan agreed to import a controlled substance." Morgan Br. at 17–18. We disagree.

We conclude at the outset that viewing the evidence in the light most favorable to the government and drawing all permissible inferences in its favor, a reasonable jury could have concluded that Morgan at least "consciously avoided" knowledge that she was participating in a conspiracy to import drugs. The government presented evidence that: (1) the defendants' trips were paid for by Scott, a virtual stranger whose address and telephone number the defendants did not know; (2) Scott flew the defendants to New York, where a friend of his brought them to a passport office to obtain passports; (3) when the defendants were unable to obtain passports in that manner, Scott flew them back to Georgia and helped them obtain passports there; (4) shortly thereafter, Scott paid in cash for the defendants' flights to New York, where they were to be met at their hotel by a person identified only as "Dustin"; (5) when Dustin met them, he gave Morgan $1,000 in one hundred dollar bills; (6) he then delivered to the defendants tickets to Paris, again paid for in cash, to fly to Paris, where they were either to be met by an unnamed friend or to call Scott to get a number for the friend; (7) although Morgan was told that the purpose of the trip was to pick up clothes in Paris, the defendants flew with this unnamed man to the Netherlands, where, he told them, the clothes were waiting; (8) the unnamed man gave the defendants an additional $600 in Dutch currency; (9) after stopping off in Amsterdam, the three traveled to yet another city, where the friend deposited the women at a hotel without giving them any idea why they had to wait for the clothes Scott had said were there days earlier, what they would do next, or when they would return home; (10) despite traveling with the man for several days and regularly talking to him on the telephone, Morgan and Hester asserted that they did not know his name; (11) the man took their carry-on bag and packed it into one of three new pieces of luggage that the defendants asserted they had never before seen; (12) although Morgan said she asked the man what was in the luggage, she said she never looked inside to determine either what was inside it or whether it contained their carry-on bag and its contents;[7] (13) the same man told the two women to lie if necessary to explain their use of newly bought tickets for their return; (14) the man gave the women rings to deliver to Dustin when they arrived in New York; (15) Morgan lied about the nature of the trip, reporting its purpose on the customs form as personal, not business, and omitting any reference to the value of clothes she and Hester were ostensibly importing into the country; (16) the women had no more than a pager number for Dustin, even though they were dependent on him for their return tickets to Georgia; (17) each piece of luggage, which the defendants lifted off the luggage carousel, weighed approximately forty pounds, a weight the jury could reasonably have found was inconsistent with luggage containing only clothing and several souvenirs; (18) the tickets

---

7. Although Morgan claimed to have asked about the contents of the luggage, her question alone is of no moment. A mere inquiry, without more, does not free a defendant from a finding of conscious avoidance in patently suspicious circumstances. *See United States* v. *Aina–Marshall,* 336 F.3d 167, 171–72 (2d Cir.2003) (concluding that the defendant consciously avoided knowing she was transporting heroin even though she claimed to have inquired into the contents of her luggage and to have been told that it contained only food).

were paid for in cash and had been bought on or about the date of each flight; and (19) with the exception of their first flight to New York, about which the record is silent, the defendants never used the return portion of their tickets. That evidence easily would have allowed a jury to conclude that Morgan and Hester at least strongly suspected, but consciously avoided knowing, that they were attempting to take something past U.S. Customs illegally.

■■■■ But, as Morgan asserts, "conscious avoidance" does not alone suffice to prove criminal intent.

[O]ur precedents establish that the doctrine may be invoked to prove defendant had *knowledge* of the unlawful conspiracy. But we do not permit the doctrine to be used to prove intent to participate in [the] conspiracy. The reason for this distinction is that common sense teaches that it is logically impossible to intend and agree to join a conspiracy if a defendant does not know of its existence.

*United States v. Reyes,* 302 F.3d 48, 54 (2d Cir.2002) (emphasis in original) (citing *United States v. Mankani,* 738 F.2d 538, 547 n. 1 (2d Cir.1984) ("If someone can consciously avoid learning of the activities and objects of a conspiracy, how can that person ever intend those events to take place?")). Instead, if direct evidence is absent, "[c]ircumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime." *United States v. Samaria,* 239 F.3d 228, 235 (2d Cir.2001). Conspiracy is a specific intent crime: To be guilty of conspiracy, "there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it."

*United States v. Gaviria,* 740 F.2d 174, 183 (2d Cir.1984) (citing *United States v. Soto,* 716 F.2d 989, 991 (2d Cir.1983)). "Proof that the defendant knew that *some* crime would be committed is not enough." *United States v. Friedman,* 300 F.3d 111, 124 (2d Cir.2002) (emphasis in original), *cert. denied,* 538 U.S. 981, 123 S.Ct. 1785, 155 L.Ed.2d 672 (2003). Here, the government had to establish to the jury's satisfaction beyond a reasonable doubt that Morgan knew that she was engaged in a conspiracy to import into the United States some controlled substance. *See, e.g., United States v. King,* 345 F.3d 149, 152 (2d Cir.2003) (per curiam); *United States v. Collado–Gomez,* 834 F.2d 280, 280 (2d Cir.1987) (per curiam).

We think that there was indeed "evidence from which it can reasonably be inferred that [Morgan] knew of the existence of the [specific] scheme [illegally to import controlled substances] alleged in the indictment and knowingly joined and participated in it." *Gaviria,* 740 F.2d at 183. As we have recounted, according to Inspector Tursellino, when she found a wrapped box in the first piece of luggage, she asked Morgan and Hester what was inside. Hester answered that the wrapped box contained toys bought in New York. Tursellino then reiterated her question, and Hester again answered that, yes, there were toys in the box. Tursellino testified that, at this point, she specifically "looked at both of them," Trial Tr., Jan. 10, 2001, at 76, and that while Hester spoke, Morgan nodded. As Tursellino discovered when she unwrapped and opened the box, it was indeed a box with toys in it; underneath the toys, though, were the hidden bags of MDA. If the jury believed Tursellino, then, since the two women knew that there were toys in the wrapped boxes in the luggage they had been given by the man prior to their departure from the

Netherlands, the jury could infer that contrary to Morgan's and Hester's accounts of their excursion abroad, the women knew about both the contents of the luggage and the contents of the wrapped boxes—in addition to the toys, the massive quantities of illicit drugs.

Of course, Hester testified that she misunderstood Tursellino's question, thinking that Tursellino was referring to the carry-on bag in which the two teddy bears and sundry souvenirs were stowed. But the jury was not required to believe her. It could, as it apparently did, infer from the fact that Morgan knew something of the contents of the luggage and the boxes within it that Morgan knew that the luggage was being used in an attempt to smuggle drugs. "[I]t is the task of the jury, not the court, to choose among competing inferences." *Martinez,* 54 F.3d at 1043 (citing *Stanley,* 928 F.2d at 577).

Construing the evidence, as we must, in the light most favorable to the government, we conclude that the combination of the substantial evidence that Morgan knew that she was involved in some sort of smuggling, together with the "toy box" evidence from which the jury could infer that she was aware that controlled substances were being smuggled, satisfy the requirement that there must be "some indicia of the specific elements of the underlying crime," *Samaria,* 239 F.3d at 235, or "some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *Gaviria,* 740 F.2d at 183 (citing *Soto,* 716 F.2d at 991). There was sufficient evidence on which to convict Morgan of conspiracy to import controlled substances into the United States.

### C. Possession and Importation

Morgan argues that even if we affirm her conviction for conspiring to import controlled substances, we must reverse her conviction for possessing and importing controlled substances because there was insufficient evidence that Morgan possessed the luggage that contained the drugs or that she was responsible for importing them. To support that contention, she points out that the bags were checked under Hester's name, that there was no proof that she physically carried them, and that Tursellino did not recall whether Morgan herself ever answered any questions relating to the bags.

We disagree. "It is not necessary for a defendant to touch or exercise *exclusive* control over contraband to possess it .... What is required is sufficient indicia of dominion and control." *United States v. Rios,* 856 F.2d 493, 496 (2d Cir.1988) (citations omitted; emphasis in original).

There was evidence introduced at trial from which a reasonable jury could have found that (1) before agreeing to fly to New York, Morgan and Hester both talked to Scott about the trip and deliberated together about going; (2) the women packed all their belongings together throughout the trip; (3) both lifted the luggage off the carousel; (4) both put all three pieces of luggage on one cart, which they together brought to customs; (5) both wheeled the cart over to their secondary inspection; (6) both together lifted the luggage to permit the inspection by Tursellino; (7) both claimed ownership of the luggage; and (8) Morgan's clothing was packed in one of the pieces of luggage in which the drugs were hidden. Although Tursellino thought Hester did most of the answering of her questions, she was confident that irrespective of which defendant was speaking, the other one always nodded.

Viewing the evidence in the light most favorable to the government and drawing all permissible inferences in its favor, *Martinez*, 54 F.3d at 1042, this evidence more than suffices to support the jury's conclusion that Morgan shared "dominion and control," *Rios*, 856 F.2d at 496, over the luggage.

## II. Admission of the Hester Letter

■ Morgan argues on appeal that the district court committed plain error when it refused to give the jury a limiting instruction that Hester's letter to her boyfriend (the "Hester letter") not be considered by the jury against Morgan because it was inadmissable hearsay. During the trial, Morgan's counsel asked for the instruction on the grounds that the Hester letter was unduly prejudicial under Rule 403 of the Federal Rules of Evidence. Counsel for Morgan and the government agree that because the ground that Morgan urges here is different from the ground that was argued on her behalf to the district court, we review for plain error the court's refusal to give the limiting charge. To constitute plain error, "there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citations, internal quotation marks, and alterations omitted). We conclude that the district court did not commit plain error in declining to give the requested jury instruction.

■ ■The district court admitted the Hester letter under Federal Rule of Evidence 807, the "catch-all" hearsay exception. According to Rule 807:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 807. A statement will be admitted under this rule if "(i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party." *United States v. Bryce*, 208 F.3d 346, 350–51 (2d Cir.1999). Morgan argues only that the letter was "neither trustworthy nor probative on the single most important question in this case, Morgan's state of mind." Morgan Br. at 35. We disagree.

Before the Supreme Court held in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), that testimonial hearsay is inadmissible under the Confrontation Clause of the Sixth Amendment if the declarant is unavailable for cross-examination, we noted that inculpatory hearsay statements made by an accomplice in certain circumstances, such as during formal police interrogation, could not be introduced as evidence of the guilt of an accused because they were untrustworthy. *See United States v. Matthews*, 20 F.3d 538, 545–46 (2d Cir.1994). We recognized that:

On the other hand, if the statement is made to a person whom the declarant believes is an ally rather than a law enforcement official, and if the circumstances surrounding the portion of the statement that inculpates the defendant provide no reason to suspect that that inculpatory portion is any less trustworthy than the part of the statement that directly incriminates the declarant, the trustworthiness of the portion that inculpates the defendant may well be sufficiently established that its admission does not violate the Confrontation Clause.

*Id.* at 546. The statement at issue in *Matthews,* made by a co-defendant to his girlfriend, was therefore held to be admissible against the defendant at trial.

In the instant case, the Hester letter,[8] like the statement at issue in *Matthews,* was not in response to police questioning. It was not written in a coercive atmosphere. It was not addressed to law enforcement authorities. To the contrary, the letter was written by co-defendant Hester to an intimate acquaintance, a boyfriend (compare the statement by a co-defendant to a girlfriend in *Matthews* ), in the privacy of her hotel room. She had no reason to expect that it would ever find its way into the hands of the police; she did not write it to curry favor with them or with anyone else. We therefore think that the Hester letter was trustworthy.

We also think that the Hester letter was probative with respect to issues in the case against Morgan. Hester and Morgan were virtually joined at the hip during the course of the events that gave rise to their prosecution. Morgan's position at trial was that she was a babe-in-the-woods who, while accepting an offer of payment for her travel to New York and Europe, had no knowledge that something untoward— or at least not this particular something untoward—was happening. Hester testified that the "we" in the Hester letter— "when *we* get home *we'll* be able to get a car and a place of our own. I hope so, and, after them just handing over 1000 $ like that [t]hey just might be telling the truth," Hester Letter, Duplicated in Joint Appendix on Appeal, at 10–11 (emphasis added)—referred to Hester and Morgan. The Hester letter thus tends to show that both women were expecting a suspiciously large payment for their willingness to go to Europe as couriers for Scott and that therefore, in the words of the jury instructions, "the defendant [Morgan] deliberately closed her eyes to what would otherwise have been obvious to her"—that she was taking part in an illicit scheme.

We find no error, let alone plain error, in the district court's refusal to instruct the jury to disregard the Hester letter in its consideration of the charges against Morgan. *See United States v. Rybicki,* 354 F.3d 124, 129 (2d Cir.2003) (in banc) (holding that if there is no error, *a fortiori,* there is no plain error).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

---

8. The Hester letter was non-testimonial hearsay and thus is not subject to the rule enunciated in *Crawford.* *See Crawford,* 124 S.Ct. at 1374.