13-1098(L)
*United States of America v. Nelson Calderon, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term, 2014

(Argued: October 17, 2014      Decided: May 12, 2015)

Docket Nos. 13-1098, 13-0766, 13-2510, 13-2740, 13-2751

————————

UNITED STATES OF AMERICA,

*Appellee,*

−v.−

NELSON CALDERON, WILFREDO SANCHEZ, AKA KING FRITO, EVA
CARDOZA, ANGELO DELEON, AKA KING TRUTH,

*Defendants-Appellants.*[*]

————————

Before:
          KEARSE, WESLEY, and CHIN, *Circuit Judges*.

————————

Defendants-Appellants Nelson Calderon, Wilfredo Sanchez, Eva Cardoza,
and Angelo DeLeon appeal from judgments of conviction imposed by the United
States District Court for the Southern District of New York (Cathy Seibel, J.)

---

[*] The Clerk of the Court is directed to amend the caption of this case as set forth above.

following a jury trial.  On appeal, Cardoza argues that there was insufficient evidence adduced at trial for a reasonable jury to conclude beyond a reasonable doubt that she was an accessory after the fact to a homicide.  For the reasons stated below, the judgment of the district court on Cardoza's accessory count is REVERSED.  Appellants' remaining legal challenges are addressed in a summary order filed simultaneously with this opinion.

DONALD DUBOULAY, Law Office of Donald Duboulay, New York, NY, *for Defendant-Appellant Nelson Calderon*; RANDALL D. UNGER, Law Offices of Randall D. Unger, Bayside, NY (Steven G. Brill, Sullivan & Brill, LLP, New York, NY, *on the brief*), *for Defendant-Appellant Wilfredo Sanchez*; CHARLES S. HOCHBAUM, Brooklyn, NY, *for Defendant-Appellant Eva Cardoza*; Mark S. DeMarco, Bronx, NY, *for Defendant-Appellant Angelo DeLeon*.

BENJAMIN ALLEE, Assistant United States Attorney (Brian A. Jacobs, Assistant United States Attorney, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

———————————

WESLEY, *Circuit Judge*:

Defendants-Appellants Nelson Calderon, Wilfredo Sanchez, Eva Cardoza, and Angelo DeLeon appeal from judgments of the district court, following a jury trial, convicting them of racketeering, narcotics, and obstruction-of-justice offenses.  The appellants were charged along with thirty other alleged members

and associates of a violent street gang. Following a five-week trial, the jury returned a verdict finding each appellant guilty on at least one count.

On appeal, appellants raise a host of legal challenges to their convictions. All save one are disposed of by a summary order issued simultaneously with this opinion. We write here only with regard to Appellant Cardoza's conviction for accessory after the fact to murder, in violation of 18 U.S.C. § 3. This opinion addresses her argument that the evidence at trial was insufficient to establish that she was an accessory after the fact to a murder. We hold that the trial evidence was not sufficient for a reasonable jury to find Cardoza guilty of that charge.

## BACKGROUND

Appellants were members and associates of a nationwide criminal organization known as the "Almighty Latin King Queen Nation" or simply the "Latin Kings." The Latin Kings operated drug markets—selling crack cocaine, powder cocaine, heroin, and marijuana—at gang-controlled locations in Newburgh, New York.

Cardoza lived with her young daughter and her boyfriend, Latin Kings member Steven Lewis (known as "Scoobz" or "Scooby"), in an apartment where she and Lewis stored drugs for the Latin Kings. Although she was not officially a member of the Latin Kings, Cardoza went on missions with gang members, collected money from drug sales, advised drug customers of Lewis's location, and sold drugs and made drug deliveries for the gang. Cardoza regularly drove Lewis to the homes of drug customers to help him make deliveries in her green Ford Explorer. Several times, narcotics customers gave cash for drugs directly to Cardoza.

This opinion deals with Cardoza's challenge to her accessory-after-the-fact conviction for helping a Latin Kings member escape after he shot and killed an aspiring member of the gang, John Maldonado (known as "Tarzan"), in retaliation for what the gang had determined was an earlier betrayal.

Maldonado and several Latin Kings members had been involved in a shooting on a block "controlled by the Bloods," a rival gang, in order to "show[] face." Trial Tr. 1482–83; 2684. A member of the Bloods shot at Maldonado's group from across the street; they returned fire. Police intervention halted the violence before anyone was injured.

4

The next day, the Latin Kings leadership planned to retaliate against the Bloods. Maldonado and a fully initiated Latin Kings member, Carlos Romero (known as "Los"), were directed to locate and kill some Bloods members. Lewis was assigned the task of helping Maldonado and Romero flee the scene. Cardoza drove Lewis and fellow Latin Kings member Luis Tambito (known as "Luch") to an intersection in Newburgh where they waited to pick up the shooters. Ultimately Lewis and Tambito were instructed by Latin Kings superiors to abandon the mission because there were no Bloods members in the area to target.

The next day, the Latin Kings again attempted to retaliate against the Bloods. This time, they sent Maldonado and another aspiring gang member, Jerome Scarlett (known as "Rudeboy"). The Latin Kings equipped both Scarlett and Maldonado with firearms. The attack on the Bloods went poorly and Scarlett was shot and killed.

Latin Kings had heard rumors that Maldonado was "infiltrating" their gang and that "he was working with the Bloods and that's why he had Rudeboy shot." Trial Tr. 1542. As a result, they suspected that Maldonado had killed Scarlett. The Latin Kings decided to retaliate by shooting Maldonado "in the

5

middle of the street." Trial Tr. 1542. They chose gang member William Overton (known as "Tutu") for the task and provided him with a firearm for that purpose. Romero was instructed to walk Maldonado down a street under the pretense of preparing for another mission "to get back at the Bloods because [of] what happened with Rudeboy." Trial Tr. 2713. Overton was to lie in wait along the path and shoot Maldonado as he went by.

Cardoza was aware of Maldonado's suspected involvement in Scarlett's death. Romero testified that he rode with Lewis and Cardoza in the Explorer after Scarlett's death and discussed how Maldonado had "shot at Rudeboy by accident." Trial Tr. 2705. Thereafter, as part of the plan to eliminate Maldonado, Overton was told to look for "a green SUV" and that Cardoza would be driving. Trial Tr. 2907.

On the day of the murder, Overton hid behind bushes beside the street, wearing gloves, a mask, and a hoodie, and waited for Maldonado. When his victim walked by, Overton jumped out from his hiding place and shot Maldonado three times, mortally wounding him.[1] Tambito, who was in close

---

[1] Maldonado was alive when police and other emergency responders arrived at the scene of the shooting; he died later that night at the hospital.

proximity to both Cardoza's vehicle, which was parked down the street, and the scene of the murder, testified that he heard the three shots.

After shooting Maldonado, Overton ran past Cardoza and Lewis waiting in the Explorer and on through a graveyard. Romero, who had run across the street after the shooting, testified that as Cardoza's vehicle approached Overton, he heard a female voice and saw a "hand come out from the -- from the driving side start saying come on, come on" waving with her left arm toward the inside of the car. Trial Tr. 2722–23. Tambito yelled to Cardoza to "[g]o get him"— meaning Overton—and Cardoza drove her vehicle in pursuit. Trial Tr. 1581. When Overton heard sirens, he discarded his gloves, mask, and hoodie, and stashed his weapon "on somebody's porch" beneath a piece of furniture. Trial Tr. 2915–16.

Overton then met up with Cardoza and Lewis in the getaway SUV. Overton testified that once he was in the vehicle he had a conversation with Lewis and Cardoza:

> [Overton]: Yeah. I was asked if I had the gun. I told Scoobz [Lewis] that I did not have the gun. And like he just told me that -- that someone would be getting in touch with me so we could -- like I could show them where the gloves were, where the jacket was, where the gun was, and whoever would be doing it would be disposing of all of it.

7

. . .

[Assistant United States Attorney Benjamin Allee]: All right. And what further discussion, if any, did you have as you drove away from the block?

[Overton]: They had told me that someone would come and pick me up and that someone would be in touch. That way, they would come back to wherever I was, come and get me, and we would dispose of -- like I would show them where the gun, the gloves, the mask and the sweatshirt were so they can get rid of it.

Trial Tr. 2921. Cardoza drove Overton to his home in Montgomery, New York.

## DISCUSSION

Cardoza argues that a rational jury could not convict her of being an accessory after the fact to a homicide committed in violation of 18 U.S.C. § 1959(a)(1), *i.e.*, the Maldonado murder, because there was insufficient evidence that she had knowledge "that the decedent was dead or dying at the time of [her] decision to provide assistance." Cardoza Br. 49 (internal quotation marks and alterations omitted). The accessory after the fact statute provides that "[w]hoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." 18 U.S.C. § 3. Murder in aid of racketeering is one such "offense against the

8

United States." *See United States v. Malpeso*, 115 F.3d 155, 161 (2d Cir. 1997); *see also* 18 U.S.C. § 1959(a)(1).

We review a challenge to the sufficiency of the evidence *de novo* and must "'affirm if the evidence, when viewed in its totality and in the light most favorable to the government, would permit any rational jury to find the essential elements of the crime beyond a reasonable doubt.'" *United States v. Yannotti*, 541 F.3d 112, 120 (2d Cir. 2008) (quoting *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004)). A guilty verdict may be based entirely on circumstantial evidence and guilt "may be inferred from the evidence so long as the inference is reasonable." *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004) (citation omitted) (internal quotation marks omitted). "The ultimate question is not whether *we believe* the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find*." *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998).

The statute applies where, *inter alia*, a person "know[s] that an offense against the United States has been committed." 18 U.S.C. § 3. Thus, to permit a verdict of guilty, there must have been sufficient evidence that Cardoza knew that she was helping a killer after he had committed a murder. Several state

courts have contemplated the nature of proof necessary to establish that one is an accessory after the fact to a murder. In some states, "a person cannot be convicted as an accessory after the fact to a murder . . . when the aid was rendered after the mortal wound was given, but before death ensued." *State v. Williams*, 49 S.E.2d 617, 618 (N.C. 1948); *see also State v. Chism*, 436 So. 2d 464, 468 (La. 1983) ("A person cannot be convicted as an accessory after the fact to a murder because of aid given after the murderer's acts but before the victim's death, but under these circumstances the aider may be found to be an accessory after the fact to the felonious assault."). The Fourth Circuit—the only circuit to have addressed this question—has expressly "decline[d] . . . to apply such a restrictive rule." *United States v. McCoy*, 721 F.2d 473, 474 (4th Cir. 1983). Instead, the Fourth Circuit has held that the "defendant must have had knowledge that [the victim] was dead *or dying* at the time of his decision" to act as an accessory. *Id.* at 475 (internal quotation marks omitted and emphasis added).

We agree with the Fourth Circuit and adopt the standard that the Government must prove that the defendant knew or must have known that the

10

victim was dead or dying at the time she decided to act as an accessory after the fact to murder.

The Government argues that the evidence was sufficient to permit a reasonable juror to infer the requisite knowledge. However, even construing the evidence in the light most favorable to the Government, no rational juror could have found that Cardoza knew that Maldonado was dead or dying during the relevant time period. *See United States v. Fernandez*, 526 F. App'x 270, 280–81 (4th Cir.), *cert. denied sub nom. Gonzalez v. United States*, 134 S. Ct. 342, *and cert. denied sub nom. Fernandez-Gradis v. United States*, 134 S. Ct. 456 (2013).

The facts the Government employs to this task are insufficient to impute knowledge of Maldonado's condition to Cardoza. Overton's testimony that he was told that Cardoza would be around the corner waiting for him provided a reasonable inference only that Cardoza knew she was driving someone away from a crime. Although there was evidence that Lewis had been told that the plan was to kill Maldonado, there was no evidence that Cardoza was present when Lewis was so informed or that he relayed that information to her. Even if Cardoza was told that Maldonado was going to be shot, there is no evidence that she knew Maldonado was dead or dying when she drove Overton away.

11

Tambito's direction to Cardoza to "[g]o get" Overton when he ran the wrong way, while showing that Cardoza understood that she was providing getaway services, does not show that she knew what Overton's mission was or that it had been successful. Lastly, in the conversation between Overton and Lewis on the drive out of Newburgh, there is no indication that either Maldonado or the shooting were discussed.

It is probable, given her proximity to the events, that Cardoza heard the shots. Tambito testified that he was nearby and that the shots were audible to him. But as the trial evidence in this case showed, and as we have recognized in the past, "[g]uns are among the tools of the narcotics trade," *United States v. Stevens*, 985 F.2d 1175, 1188 (2d Cir. 1993). Shots fired in that context are not always intended to be lethal and, even so intended, not all gunshots are fatal. The Latin Kings and the Bloods would frequently "shoot at" each other to "show face" or to protect their drug-selling territory. *See, e.g.* Tr. 1482–84; 1545; 1604–08; 1672. The jury was not entitled to infer, without more, that shots fired within earshot of Cardoza gave her knowledge that Maldonado was dead or dying.

Based on the totality of the circumstances, no rational juror could find that when she drove him out of Newburgh, Cardoza knew that Overton had shot

12

Maldonado and that Maldonado was dead or dying. Thus, the evidence presented to convict Cardoza of being an accessory after the fact to a homicide was insufficient.

## CONCLUSION

For the reasons stated above, the judgment of the district court convicting Cardoza of accessory after the fact to a federal offense in violation of 18 U.S.C. § 3 is **REVERSED**. As decided in the accompanying summary order, Cardoza's convictions on all other counts are **AFFIRMED**. The case is **REMANDED** as to Cardoza, with instructions for the district court to dismiss Count Forty-Three of the Indictment in 10 CR 392, and for resentencing on the counts of conviction.